**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON**

**CIVIL ACTION NO. 2:21-CV-016 (WOB-EBA)**

**JAMES CLEMONS**                                                                  **PLAINTIFF**

**VS.**                            **MEMORANDUM OPINION AND ORDER**

**HILLSHIRE BRANDS COMPANY**                                      **DEFENDANT**

This is a lawsuit brought by James Clemons ("Clemons") against Hillshire Brands Company ("Hillshire") for alleged employment discrimination based on disability. Currently before the Court are Defendant's Motion for Summary Judgment, (Doc. 41), Defendant's Motion to Strike or Disregard Plaintiff's Affidavit, (Doc. 54), and Plaintiff's Motion to Exclude the Declaration of Lauren Miller or, in the alternative, to Take Additional Discovery, (Doc. 56).[1]

The Court has carefully reviewed this matter and, being advised, now issues the following Memorandum Opinion and Order.

---

[1] Defendant has also filed a Motion to Strike or Disregard Plaintiff's Sur-Reply, (Doc. 57), which was filed in opposition to Defendant's Motion for Summary Judgment. (Doc. 62). Although Defendant correctly points out that Plaintiff did not seek the leave of the Court to file his Sur-Reply, (*id.* at 1), the Court will nonetheless deny Defendant's Motion in favor of considering all briefing submitted by both parties. For the same reason, the Court will grant Defendant's Motion for Leave to File a Sur-Reply in opposition to Plaintiff's Motion to Exclude the Declaration of Lauren Miller. (Doc. 68).

***Factual and Procedural Background***

## A. Plaintiff's Employment with Defendant

Plaintiff Clemons was employed by Defendant Hillshire[2] on two separate occasions, most recently beginning on July 21, 2016. (Doc. 41 at 1; Doc. 48 at 1). Clemons began his second term of employment with Hillshire as a Sanitation Team Member but was promoted to Third-Shift Production Supervisor on December 18, 2017. (Doc. 41 at 1-2; Doc. 48 at 1).

In this position, Clemons worked from 10:45 p.m. to 8:00 a.m.[3] and claims he regularly assisted his team with "strenuous physical activity," including lifting and carrying equipment weighing between fifty and seventy-five pounds, walking through the facility, crouching, raising his arms above his shoulders, and twisting his body. (Doc. 41 at 1; Doc. 48 at 1-2; Doc. 48-1, Clemons Aff. ¶¶ 6, 8). Hillshire, on the contrary, argues that it never required Clemons to engage in physical work as a supervisor. (Doc. 55 at 4-5; Doc. 55-1, Lucas Dep. at 79:22-80:6).

As a member of Hillshire's management team, Clemons was expected to maintain a good attendance record in order to set "an

---

[2] Hillshire is a wholly owned subsidiary of Tyson Foods, Inc. ("Tyson"). (Doc. 3). As a result, many of Hillshire's records are printed on Tyson's letterhead.

[3] Clemons's Affidavit states that the third shift at Hillshire was between 10:45 a.m. and 8 a.m., but this is likely a typographical error. (*See* Doc. 48-1, Clemons Aff. ¶ 6).

example of professional behavior" for those he supervised. (Doc. 41 at 2; Doc. 41-2 § 4.4). However, Hillshire informed Clemons that his absences from work meant that he had failed to meet its expectations regarding reliability on three documented occasions: May 16, 2018,[4] August 7, 2018,[5] and August 23, 2019.[6] (Doc. 41 at 2-3; Doc. 41-3 at 1; Doc. 41-4 at 1; Doc. 41-5 at 1). Each notice informed Clemons that continued attendance issues could result in further discipline and/or termination.[7] (Doc. 41-3 at 1; Doc. 41-4 at 1; Doc. 41-5 at 1).

## B. Plaintiff's Pain and Associated Absences

On September 26, 2019, Clemons sent a text message to his supervisor, Third-Shift Manager Lori Lucas ("Lucas"), informing her that he planned to use his "last two doctors days" for that night and the following night's shifts due to "issues with [his] hip and neck" which required an appointment with an orthopedic

---

[4] The notice issued on May 16, 2018, was styled as a "Documented Coaching on Supervisor Responsibilities and Standards of Behavior." (Doc. 41-3 at 1).

[5] The "Disciplinary Note to File" issued on August 7, 2018, indicates that Clemons had a total of twelve absences in the preceding twelve months that were not covered by approved vacation, personal days, or bereavement time. (Doc. 41-4 at 1).

[6] Clemons refused to sign the "Disciplinary Note to File" issued on August 23, 2019. (Doc. 41-5 at 1).

[7] The latter two notices specifically noted that "[f]urther unreliability will result in discipline and may put your job in jeopardy," (Doc. 41-4 at 1; Doc. 41-5 at 1), while the first notice informed Clemons that continued unacceptable attendance "could lead to additional corrective action up to and including termination," (Doc. 41-3 at 1).

specialist and might be caused by a pinched nerve. (Doc. 41 at 3; Doc. 48 at 4; Doc. 48-9 at 1).

Lucas responded by informing Clemons that it was her understanding that members of management, like him, were not entitled to "doctor days." (Doc. 41 at 3; Doc. 48-9 at 2). She also stated that "[s]upervisors don't do physical work," to which Clemons responded that his job was physical if it was "done right." (Doc. 48-9 at 3, 5). Lucas ended the conversation by stating that "others['] actions effect[] everyone" but that she would not "debate" the issue with Clemons. (*Id.* at 5).

The next day, on September 27, Clemons sought treatment from Dr. Rebecca Popham, complaining of neck and left hip pain that was made worse by ambulation and caused numbness and tingling in his leg and arm. (Doc. 41 at 4; Doc. 41-8 at 4; Doc. 48 at 5). At that appointment, Clemons noted that he could comfortably stand for eight to ten hours, sit for forty-five to sixty minutes, walk for eight to ten hours, and perform all housework, leisure activity, and work. (Doc. 41 at 4; Doc. 41-8 at 6–7). Dr. Popham ultimately diagnosed Clemons with "[c]ervical pain and left snapping hip syndrome" and prescribed physical therapy, oral steroids, Tylenol, and ibuprofen. (Doc. 41 at 5; Doc. 41-8 at 5; Doc. 48 at 6).

On October 3, 2019, Clemons missed a shift, but asked Lucas to use one of his vacation days, to which she agreed. (Doc. 48-9 at 6). Eleven days later, on October 14, Clemons informed Lucas

4

that he would be missing another shift. (*Id.* at 7). Hillshire's records reflect that Clemons also missed shifts on October 15 and 16, 2019. (Doc. 48-10 at 1).

On October 15, 2019, Clemons submitted a request for leave under the Family and Medical Leave Act of 1993 ("FMLA") to Unum, Hillshire's third-party leave provider. (Doc. 41 at 5; Doc. 41-10 at 1). On October 22, Unum confirmed that Clemons was eligible for FMLA leave beginning on October 14, 2019, but also noted that he was required to return a completed Certification of Health Care Provider Form and his leave would not be approved if the Certification was not received by November 2, 2019. (Doc. 41-10 at 1-2).

Dr. Popham returned the Certification Form to Unum the following day, describing Clemons's health conditions as "cervical pain" and left "hip pain," with a probable duration of six months. (Doc. 41-11 at 1-2). She also noted that Clemons was able to perform all functions of his job, but that it was medically necessary for Clemons to be off work due to episodic flare-ups with an estimated frequency of twice per month for ten hours at a time. (*Id.* at 2).

On October 25, 2019, Clemons received a "Final Notice" for failing to achieve reliability expectations. (Doc. 41 at 7; Doc. 41-18 at 1; Doc. 48 at 6). It noted that he had missed the week of September 23 but had not followed the process for Unum to approve

that period of leave pursuant to the FMLA. (Doc. 41-18 at 1). On that Notice, Clemons wrote, "When FMLA is submitted through Unum for the days for reliability will this go away [sic]. As each day would be accounted for [sic]." (*Id.*; Doc. 41 at 7). Clemons then missed four more days of work, from October 29 to November 1, 2019. (Doc. 41 at 7; Doc. 41-19 at 1).

On November 4, 2019, Unum sent Dr. Popham a copy of a letter originally sent to Clemons, informing her that her original submission was insufficient to support Clemons's request for FMLA leave because the probable duration she had specified was insufficient and she had failed to provide some relevant information. (Doc. 41 at 6; Doc. 41-12 at 1). The same day, Dr. Popham returned an updated Certification Form (the "Certification"), shortening the probable duration of the condition from six months to twelve weeks and providing the missing information. (Doc. 41 at 6; Doc. 41-13 at 3).

The following day, on November 5, Clemons sent another text message to Lucas, asking if he could use his three remaining vacation days that week. (Doc. 41 at 7; Doc. 48-9 at 10). The next day, Lucas confirmed that those three vacation days were approved. (Doc. 41 at 7; Doc. 41-20 at 2).

On November 12, Unum again sent Dr. Popham a copy of a letter originally sent to Clemons, stating that the Certification was still insufficient because Clemons had "taken absences which

exceed [the] frequency and duration" of episodic flare-ups estimated. (Doc. 41 at 6; Doc. 41-14 at 1). Two days later, Dr. Popham responded to Unum via fax, stating, "Patient has not requested any changes in his FMLA." (Doc. 41 at 6; Doc. 41-15 at 1).

On November 19, 2019, Unum sent a letter to Clemons informing him that the due date to provide an updated Certification had been extended to November 29, 2019, but noting that if the Certification was not received by that date, his leave would not be approved and "may be treated according to [his] employer's attendance policy." (Doc. 41-16 at 1).

On November 20, 2019, Clemons sent Lucas a text, informing her that he would not be able to work that night and that his doctor was prescribing additional medication and wanted to order an MRI. (Doc. 48 at 7; Doc. 48-9 at 11). Clemons missed five additional days of work between December 2 and 6, 2019. (Doc. 41-19 at 1; Doc. 48-9 at 13-15).

On December 6, 2019, Clemons had an appointment with Dr. Howard Schertzinger, who diagnosed him with a left brachial plexus strain, a cervical sprain, a C5/6 spondylotic bulge, and a headache disorder after reviewing the results of his MRI. (Doc. 41-22 at 1-2). Dr. Schertzinger prescribed physical therapy and a course of medication. (*Id.* at 2).

Clemons informed Lucas on December 9 that he would "be out one more night" and that his issues were being caused by discs in his neck bulging into his spinal nerve. (Doc. 48-9 at 16).

On December 10, 2019, Unum informed Clemons that his intermittent FMLA leave was approved as to "treatments" between October 28, 2019 and January 5, 2020,[8] but denied as to "episodes of incapacity" because he had not submitted a qualifying medical certification. (Doc. 41 at 6; Doc. 41-17 at 1-2). The letter also noted that Unum was "unable to grant any further extensions." (Doc. 41 at 6; Doc. 41-17 at 1).

Two days later, on December 12, Clemons sent another text message to Lucas, informing her that he would not be at work that night or the following night. (Doc. 48-9 at 17).

On December 17, Dr. Popham wrote a "Work Status Note" to excuse Clemons's absences on October 15, 16, 29, 30, 31, and November 1, 2019, but Unum determined that those absences were reported as "episodes," not "treatments," and therefore they did not qualify for approval as FMLA leave. (Doc. 41 at 9; Doc. 41-24 at 1).

On December 20, 2019, Hillshire terminated Clemons's employment for "failure to meet the standards of reliability and

---

[8] The only missed shifts Unum reported as "approved" for treatments were on October 28, 2019, and November 4, 2019. (Doc. 48-10 at 1-2). Clemons does not argue that any of his other absences were incurred because of treatments.

Management Standards of Behavior." (Doc. 41 at 8-9; Doc. 41-19 at 1). The Termination Notice specifically stated that Clemons missed work on October 29, 30, 31, and November 1, 2019, in addition to a "full week of work at the beginning of December," and that none of those missed days were covered by the FMLA. (Doc. 41-19 at 1).

Dr. Schertzinger wrote a "Work Status Note" on December 30, 2019, stating that Clemons's absences on December 2-6, 9, and 11-13 were due to flare-ups. (Doc. 41-22 at 8). However, Hillshire points out that Dr. Schertzinger's post-termination note was neither submitted to it nor to Unum and Clemons does not argue otherwise. (*See* Doc. 41 at 9).

### C. This Lawsuit

Clemons filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on February 7, 2020, citing discrimination based on disability and retaliation. (Doc. 41-25 at 1). The EEOC issued a Notice of Right to Sue to Clemons on December 7, 2020. (Doc. 41-27 at 1).

Clemons filed the instant lawsuit in Campbell County Circuit Court one week later, on December 14, 2020, and Hillshire properly removed it to this Court. (Doc. 1). Clemons alleges six causes of action: (1) FMLA interference; (2) FMLA retaliation; (3) disability discrimination in violation of the Americans with Disabilities Act (ADA) and the Kentucky Civil Rights Act (KCRA);

(4) failure to accommodate in violation of the ADA and the KCRA; (5) retaliation in violation of the ADA and the KCRA; and (6) wrongful termination in violation of public policy. (Doc. 1-1).

### *Analysis*

Under federal law, summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). "In determining whether there exists a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the non-moving party." *See Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 992 (6th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

Summary judgment is inappropriate if the evidence would permit a reasonable jury to return a verdict for the non-moving party. *Id*. However, "[t]he non-moving party also may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); Fed. R. Civ. P. 56(e)(2)).

## A. FMLA Interference

"The FMLA entitles eligible employees to take up to twelve weeks of leave during any twelve month period '[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Demyanovich v. Cadon Plating & Coatings, LLC*, 747 F.3d 419, 427 (6th Cir. 2014) (quoting 29 U.S.C. § 2612(a)(1)(D)). "Employers may not interfere with, restrain, or deny 'the exercise of or the attempt to exercise' FMLA rights." *Pearson v. Cuyahoga Cnty.*, 596 F. App'x 358, 364 (6th Cir. 2014) (quoting 29 U.S.C. § 2615).

In the absence of direct evidence, which Clemons does not claim to have, an employee may prove FMLA interference by using the *McDonnell Douglas* burden-shifting framework. *See Demyanovich*, 747 F.3d at 427 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under this framework, the employee bears the initial burden of establishing a prima facie case. *Id.* (citing *Donald v. Sybra, Inc.*, 667 F.3d 757, 761–62 (6th Cir. 2012)). If the employee satisfies that burden, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* (citing *Donald*, 667 F.3d at 761–62). If the employer provides such a reason, the burden shifts back to the employee to rebut the employer's proffered reason by establishing that it was pretextual. *Id.* (citing *Donald*, 667 F.3d at 761–62).

To establish a prima facie case of FMLA interference, the plaintiff must show that: (1) he was an eligible employee; (2) the defendant was an employer covered by the FMLA; (3) he was entitled to take leave under the FMLA; (4) he notified the defendant of his intent to take leave; and (5) the defendant denied him benefits to which he was entitled under the FMLA. *Id.* (citing *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006)).

Hillshire does not dispute that Clemons was an eligible employee, that it was an employer covered by the FMLA, that Clemons notified it of his intent to take leave, or that it declined to approve FMLA leave for at least some of the episodic flare-ups Clemons claims to have experienced. (*See* Doc. 41 at 12-14). Therefore, the only issue in dispute is whether Clemons was entitled to take leave under the FMLA for those episodes.[9]

First, Hillshire argues that Clemons cannot show that he has a "serious health condition" entitling him to take leave under the FMLA. (*Id.* at 13). A "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves– (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11).

---

[9] Clemons argues that Unum confirmed that he was entitled to FMLA leave. (Doc. 48 at 24). On the contrary, Unum actually stated that Clemons was an eligible employee under the FMLA, (Doc. 41-10 at 1), but ultimately determined that he was not entitled to FMLA leave for his episodes of incapacity, (Doc. 41-17 at 1–2; Doc. 48-10 at 1).

It is undisputed that Clemons did not receive inpatient care at any relevant time and, thus, he must show that he received continuing treatment by a health care provider, which would include a period of incapacity : (1) of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity; (2) due to pregnancy; (3) due to a chronic serious health condition which requires at least two visits per year for treatment by a health care provider, continues over an extended period of time, and may cause episodic rather than a continuing period of incapacity; (4) which is permanent or long-term; or (5) is incurred in order to receive multiple treatments. *See* 29 C.F.R. § 825.115.

Dr. Popham's Certification is evidence from which a reasonable jury could find that that Clemons's pain satisfies the standard for a "chronic serious health condition," because she confirmed that it required one to two treatments per week, began "years ago," would likely continue for twelve weeks, and would cause episodic flare-ups on an intermittent basis. (*See* Doc. 41-13 at 3–4). Hillshire attempts to argue that Clemons's pain cannot be classified as a chronic condition due to Dr. Popham's assertion that it would only last twelve weeks, (*see* Doc. 41 at 13 n.4), but that argument is particularly unpersuasive because Unum, Hillshire's own third-party leave provider, approved Clemons's

leave under the FMLA for treatments related to his condition. (*See* Doc. 41-17 at 1-2).

However, Hillshire's argument that Clemons failed to submit the necessary documentation to support his request for leave regarding his pain flare-ups fares differently. (*See* Doc. 41 at 12-14). "An employer may require that a request for [FMLA] leave . . . be supported by a certification issued by the health care provider of the eligible employee . . . ." 26 U.S.C. § 2613(a). "At the time the employer requests certification, the employer must also advise an employee of the anticipated consequences of an employee's failure to provide adequate certification." 29 C.F.R. § 825.305(d).

It is unclear and the parties did not analyze whether it was appropriate for Unum to reject Clemons's request for leave under the FMLA entirely because Dr. Popham's original Certification "provided an estimate of the frequency of the episodic flare-ups of [Clemons's] condition," but he took "absences which exceed th[at] frequency and duration," (*see* Doc. 41-14 at 1). The Sixth Circuit has found that a certification is sufficient if it states the date upon which the serious health condition began, the condition's probable duration, the appropriate medical facts regarding the condition, and a statement that the employee is unable to perform his position's duties. *See Brenneman v.*

*MedCentral Health Sys.*, 366 F.3d 412, 422 (6th Cir. 2004) (citing 29 U.S.C. § 2613(b)).

Dr. Popham's Certification does not provide the date on upon which the condition began, stating only that Clemons's condition began "years ago," and also provides that Clemons is able to perform all functions of his job, while simultaneously stating that it is nonetheless medically necessary for him to miss work due to episodic flare-ups. (Doc. 41-13 at 3–4). However, to the extent that these are deficiencies, they were not cited by Unum in any letters to either Dr. Popham or Clemons. (*See* Doc. 41-14; Doc. 41-16; Doc. 41-17).

Because Unum did not provide Clemons with notice and the opportunity to cure any deficiencies related to the date his condition began or his ability to perform his assigned duties, Hillshire may not rely on them now as grounds for the inadequacy of the Certification. *See* 29 C.F.R. § 825.305(c) (providing that an employer must provide an employee with seven days to cure a deficient medical certification); *see also Stanley v. FCA US, LLC*, No. 3:19-CV-640, 2020 WL 2839440, at *4 (N.D. Ohio May 31, 2020) (finding that where a physician's certification stated that an employee was able to perform the essential functions of his job but also stated that the employee's condition merited intermittent leave, the certification was ambiguous and required the employer to give the employee a chance to cure the deficiency).

15

As to the sole reason Unum did cite for finding the Certification insufficient, that Clemons had already incurred absences exceeding the twice-per-month frequency estimated by Dr. Popham, (Doc. 41-14 at 1; Doc. 41-16 at 1; Doc. 41-17 at 1), Hillshire has not cited case law or statutory authority for the proposition that an initial request for leave under the FMLA may be denied on that basis.

However, assuming for the purpose of argument that Unum's initial denial of Clemons's request for FMLA leave was improper, that denial cannot support Clemons's FMLA interference claim because he has not established or even alleged that it caused him harm. *See Edgar*, 443 F.3d at 507-08 (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)) (holding that employees making FMLA entitlement or interference claims must establish that their employer's statutory violation caused them harm). Rather, Clemons was not terminated until after Unum requested a medical recertification as to frequency and Hillshire cited absences that occurred after Unum's request for recertification in Clemons's Termination Notice. (*See* Doc. 41-19 at 1).[10] Accordingly, the relevant question is whether Unum's recertification request and

---

[10] Clemons argues that the Termination Notice only cited the four absences on October 29, 30, 31, and November 1, (Doc. 48 at 18), but that ignores the Notice's statement that Clemons "also missed a full week of work at the beginning of December that was not aligned with [his] FMLA leave nor reported to Unum." (*See* Doc. 41-19 at 1).

ultimate denial of Clemons's leave under the FMLA, subsequent to that request, were proper.

Employers may properly "require [an] employee to 'obtain subsequent recertifications on a reasonable basis.'" *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 554 (6th Cir. 2006) (quoting 29 U.S.C. § 2613(e)). Although recertification is generally only appropriate every thirty days, it "may be requested more frequently if '[c]ircumstances described by the previous certification have changed significantly (*e.g.*, the duration or frequency of the absence, the nature or severity of the illness, complications).'" *Graham v. BlueCross BlueShield of Tenn., Inc.*, 521 F. App'x 419, 423 (6th Cir. 2013) (quoting 29 C.F.R. § 825.308(c)(2)).

For example, it would be appropriate for an employer to request a recertification in less than thirty days if the original certification provided that an employee would need leave for one to two days when he suffered a migraine headache, but the employee's absences for his last two migraines lasted four days each. *Id.* at 424 (citing 29 C.F.R. § 825.308(c)(2)). If an employee fails to submit a properly requested medical recertification, the employer may deny the employee FMLA leave. *Id.; see also* 29 C.F.R. § 825.313(c) ("If the employee never produces the recertification, the leave is not FMLA leave.").

Thus, it was proper for Unum to request a recertification on the basis it identified: that Clemons had taken absences that exceeded the frequency identified by Dr. Popham. (*See* Doc. 41-14 at 1; Doc. 41-16 at 1; Doc. 41-17 at 1). Clemons does not dispute that he missed work due to pain flare-ups more than twice per month, including in the period after Dr. Popham originally certified that he required two ten-hour periods of leave per month but before Unum requested its recertification and in the period after Dr. Popham recertified her original two-day estimate.[11]

Nor does he allege that he ever provided Unum or Hillshire with a medical recertification attesting to his need for more frequent absences, even after he received explicit notice that failure to provide such a recertification would result in unapproved leave that would be treated according to Hillshire's attendance policy. (*See* Doc. 41-16 at 1).[12] Accordingly, Unum and,

---

[11] Clemons missed four days of work in the twenty-day period between Dr. Popham's original Certification on October 23 and Unum's request for recertification on the basis of frequency on November 12. (Doc. 41-11 at 2; Doc. 41-14 at 1; Doc. 41-19 at 1). Clemons also missed at least nine days of work between November 20 and his termination on December 20, subsequent to Dr. Popham's recertification of the two-day estimate on November 14. (Doc. 41 at 6; Doc. 41-15 at 1; Doc. 48-9 at 12-17).

[12] Although Clemons testified that members of Hillshire's Human Resources team told him that he was not required to supply them with medical documentation or keep in touch with Unum, (Doc. 48 at 3; Doc. 48-1, Clemons Aff. ¶ 14), he does not dispute that he received letters from Unum informing him that his health care provider must complete and return a certification form in order for his leave to be approved under the FMLA. (*See* Doc. 41-10 at 1-2; Doc. 41-16 at 1). Moreover, he undisputedly received and signed a Final Notice regarding his failure to follow the process to get absences approved as FMLA leave, and, on that document, he handwrote a note in which he referenced his obligation to submit FMLA requests to Unum in order to make his unapproved absences "go away."

by extension, Hillshire, appropriately determined that Clemons was not entitled to leave under the FMLA for the episodic absences he incurred after the request for recertification and Hillshire could properly count those absences against him for purposes of disciplinary action and termination. *See Graham*, 521 F. App'x at 425 (finding that an employer could "properly count the days after which recertification was necessary in support of [an employee's] termination").

Therefore, Clemons has failed to establish a prima facie case of FMLA interference because he cannot show that Hillshire caused him harm by denying him leave to which he was entitled under the FMLA. The Court need not address the subsequent portions of the *McDonnell Douglas* burden-shifting framework with respect to this claim.

**B. FMLA Retaliation**

Because Clemons does not argue that he has introduced direct evidence of FMLA retaliation, his FMLA retaliation claim must also be analyzed under the *McDonnell Douglas* burden-shifting framework. *See Demyanovich*, 747 F.3d at 432–33.

---

(Doc. 41-18 at 1). Accordingly, no reasonable jury could find that Clemons was unaware of Hillshire's policy that his failure to submit the certification to Unum would result in denial of his request for FMLA leave and termination for further absences.

###### i.   *Prima Facie Case*

To establish a prima facie case of FMLA retaliation, an employee must show: (1) he was engaged in an activity protected by the FMLA; (2) his employer knew he was exercising his rights under the FMLA; (3) after learning of his exercise of FMLA rights, his employer took an adverse employment action against him, and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 616 (6th Cir. 2019) (citing *Donald*, 667 F.3d at 761).

Hillshire does not dispute that Clemons attempted to take leave under the FMLA, that it knew about Clemons's attempt to exercise his rights, or that it took an adverse action against him by terminating him. Rather Hillshire argues that Clemons's claim fails because he has not established the fourth element by showing causation. (*See* Doc. 41 at 16).

The only evidence Clemons points to in support of causation is the temporal proximity between his attempt to exercise his rights under the FMLA and his termination. (*See* Doc. 48 at 17–18). Clemons submitted his initial request for FMLA leave to Unum on October 15, 2019, and he was terminated on December 20, 2019,

meaning that nine weeks and three days passed between those two events. (Doc. 41-10 at 1; Doc. 41-19 at 1).[13]

In cases where, as here, temporal proximity is the only evidence of causation, "temporal proximity only suffices to make a plaintiff's prima facie case where the adverse employment action occurs 'very close in time after an employer learns of a protected activity.'" *See Stein v. Atlas Indus., Inc.*, 730 F. App'x 313, 319 (6th Cir. 2018) (quoting *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 284 (6th Cir. 2012)). As to how close "very close" must be, the Sixth Circuit has emphasized that "the line should be drawn shy of the ten-week mark." *Id.* (comparing a case in which an eight-week period was sufficient with a case in which a ten-week period was insufficient). Indeed, Clemons has not pointed to any case in which a court held that a period longer than nine weeks, standing alone, was sufficient to establish causation.

However, even if a nine-week period could be enough, courts in the Sixth Circuit have "found that evidence that the employer had been concerned about a problem before the employee engaged in

---

[13] In a text message to Lucas, Clemons referenced FMLA leave on October 3, 2019, (Doc. 48-9 at 6), and thus, using this date would mean that eleven weeks passed between his first attempt to exercise his rights and his termination. However, it is unclear whether Lucas relayed Clemons's intent to take FMLA leave to anyone else at Hillshire. *See Bush v. Compass Grp. USA, Inc.*, 683 F. App'x 440, 452 (6th Cir. 2017) (explaining that the relevant timeframe is "the 'time after an employer learns of protected activity'" (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008))). Thus, the Court will use the nine-week period in its analysis in order to comply with its obligation to draw all factual inferences in favor of Clemons at this stage of the case.

protected activity undercuts the significance of the temporal proximity." *See DeVore v. United Parcel Serv., Inc.*, No. 3:19-CV-00731-CRS, 2022 WL 2329124, at *4 (W.D. Ky. June 28, 2022), *aff'd sub nom. DeVore v. United Parcel Serv. Co.*, No. 22-5638, 2023 WL 2181139 (6th Cir. Feb. 23, 2023) (internal quotation marks omitted) (collecting cases).

Further, the Sixth Circuit has held that, "[w]hen the employer 'proceed[s] along lines previously contemplated,' we must not take the temporal proximity of the adverse employment action as evidence of causality." *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 507 (6th Cir. 2014) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (per curiam)).

Here, the Documented Coaching that Hillshire issued to Clemons on May 16, 2018, and the Disciplinary Notes it issued to him on August 7, 2018, and August 23, 2019, each of which related to Clemons's attendance issues, predated the earliest point at which he informed anyone of his intent to exercise his rights under the FMLA, and advised him that continued absences could lead to his termination, (*see* Doc. 41-3 at 1; Doc. 41-4 at 1; Doc. 41-5 at 1), prohibit the temporal proximity from serving as evidence of causation.

Although Clemons attempts to argue that these documents should not be considered by the Court because they are outside the "Relevant Period," which he determined began on September 1, 2019,

22

(Doc. 48 at 1, 18), Clemons has not cited authority for the proposition that he may unilaterally provide a date, with no apparent factual significance, beyond which the Court is prohibited from considering otherwise relevant evidence. Clemons's bare contention that the Court should exclude these documents is wholly unpersuasive.[14]

Further, "'an intervening legitimate reason' to take an adverse employment action 'dispels an inference of retaliation based on temporal proximity.'" *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 628 (6th Cir. 2013) (quoting *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 472 (6th Cir. 2012)). Here, Hillshire has cited the unapproved absences Clemons accrued in the period between his initial request for FMLA leave and his termination as an intervening legitimate reason for its adverse action against him. (Doc. 41 at 17). Because, as discussed above, the cited absences were not protected under the FMLA, they serve as an additional

---

[14] To the extent that Clemons is attempting to argue, without so stating, that the "Relevant Period" encompasses the 180 days before he filed his EEOC charge, that argument is misplaced. "As a general rule, Title VII requires plaintiffs to file a charge of discrimination with the EEOC within 180 days of the alleged discriminatory act." *Jones v. Fed. Express Corp.*, 952 F.3d 815, 818 (6th Cir. 2020) (citing 42 U.S.C. § 2000e-5(e)(1)). Thus, this limitation period applies to bar Clemons from claiming, under Title VII, that Hillshire discriminated against him more than 180 days before he filed his EEOC charge. It does not bar the Court from considering evidence relevant to both Title VII and non-Title VII claims that originated more than 180 days before Clemons filed his EEOC charge. This is particularly true in light of Hillshire's argument that it proceeded along lines it contemplated before Clemons engaged in protected activity because relevant evidence must necessarily come from the period preceding the alleged discrimination.

reason to discount the temporal proximity between Clemons's attempt to exercise his rights and his termination.[15]

Accordingly, because Clemons has not pointed to evidence of causation other than temporal proximity, which is insufficient given the facts of this case, he has failed to establish a prima facie case of FMLA retaliation.

### ii.  Pretext

Although Clemons's FMLA retaliation claim fails as a matter of law because he cannot establish a prima facie case, even if this Court could find sufficient evidence to conclude otherwise, Hillshire has put forth a legitimate nondiscriminatory reason for Clemons's termination, namely that he incurred numerous unapproved absences in violation of company standards for management-level employees. *See Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 569 (6th Cir. 2023) (internal citation omitted) (finding that "repeated absences" was a "clearly legitimate, nondiscriminatory reason[] to terminate" an employee).  This shifts the burden back

---

[15] Clemons contends that Hillshire cannot advance an "intervening legitimate reason" argument because "[i]t never threatened discipline or termination until months after Mr. Clemons invoked his rights under the ADA and the FMLA." (Doc. 48 at 19). However, this argument fails both because it is based on an inaccurate version of the facts, as Hillshire did inform Clemons that continued attendance issues would result in discipline and/or termination on at least three occasions before he invoked his ADA/FMLA rights, (*see* Doc. 41-3 at 1; Doc. 41-4 at 1; Doc. 41-5 at 1), and because an *intervening* reason necessarily must be based on conduct that occurred *between* Clemons's invocation of his rights and his termination. Thus, it necessarily could not be documented before Clemons initially attempted to exercise his rights.

to Clemons to prove that Hillshire's proffered reason was a pretext for unlawful retaliation. *See Demyanovich*, 747 F.3d at 432–33.

"A plaintiff may establish pretext by showing that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action." *Seeger*, 681 F.3d at 285 (citing *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)). "[M]ere conjecture that the employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 470 (6th Cir. 2002) (internal citation and quotation marks omitted).

Here, Clemons does not argue that Hillshire's proffered reason has no basis in fact, as he does not dispute that he missed work on the referenced days and, even if he did argue that Hillshire incorrectly classified his absences as "unapproved," he has failed to establish that he was entitled to FMLA protection for them, as discussed above. Rather, Clemons argues that Hillshire's proffered reason did not motivate its action because it was actually motivated by animus harbored by his supervisor, Lucas, and that the proffered reason was insufficient to warrant his termination, as other employees engaged in similar conduct but were not terminated. As discussed below, each of these arguments fails.

First, Clemons contends that it "isn't plausible" that Lucas played no part in his termination and that she was motivated to terminate him due to her "exasperation and impatience" with him and the fact that his attempts to exercise his rights under the FMLA "made her life harder." (Doc. 48 at 20). However, assuming this evidence is sufficient to create a genuine issue of material fact as to Lucas's internal motivations, Clemons has not introduced evidence from which a reasonable jury could conclude that she was responsible for the decision to terminate him.

The Sixth Circuit has held that, even where an employee's supervisor harbors discriminatory animus and the supervisor intends to cause an adverse employment action based on that animus, the employer will not be liable if its independent investigation results in an adverse action for reasons unrelated to the supervisor's bias. *Voltz v. Erie Cnty.*, 617 F. App'x 417, 423–24 (6th Cir. 2015) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011)).

Clemons attempts to show Lucas's involvement in his termination by pointing to alleged discrepancies between Hillshire's Answers to his Interrogatories and the deposition of Hillshire's Rule 30(b)(6) representative, Jason Grayson ("Grayson"), but these discrepancies, to the extent there are any, do not provide any evidence that Lucas participated in the termination decision. (*See* Doc. 48 at 20).

26

In Hillshire's Answers to Clemons's Interrogatories, it stated that Lauren Miller ("Miller") participated in the decision to terminate his employment. (Doc. 48-4 at 12). However, Grayson, who was the Regional Human Resources Director and Miller's supervisor, testified that he also participated in the decision, along with members of the company's legal department. (Doc. 48-3, Grayson Dep. at 30:17-22, 37:4-13, 38:12-21). Further, Grayson testified that he did not speak to any of Clemons's supervisors regarding his termination, although he and Miller did review information reported by supervisors about Clemons's absences and he had previously spoken to Lucas about Clemons. (*Id.* at 23:4-9, 38:24-39:8).

Accordingly, the facts Clemons points to, that Grayson testified that he participated in the decision, but was not referenced in the company's Answers to Clemons's Interrogatories, and that he testified that he had spoken to Lucas about Clemons, but had not communicated with her regarding Clemons's termination, are not evidence that Lucas participated in the termination decision.

Although Hillshire erroneously failed to name Grayson as a participant in the termination decision during the early stages of discovery, such a failure is not evidence that Lucas also participated in the decision, particularly because Lucas's

testimony as to her involvement is consistent with Grayson's.[16] Clemons's contention that it is "implausible" that Grayson and Lucas could have a conversation about Clemons regarding something other than the decision to terminate him, (Doc. 48 at 20), amounts to nothing more than conjecture. Rather, Hillshire has established that Grayson conducted an independent investigation, which included reviewing Lucas's reports of Clemons's absences, and that he and Miller decided to terminate Clemons because of those absences, not because of any animus harbored by Lucas. (*See* Doc. 41-28, Grayson Decl. ¶¶ 3-4).

Second, Clemons argues that his absences were insufficient to warrant his termination, as other employees also incurred absences but were not terminated by Hillshire. (Doc. 48 at 18-19). However, Hillshire has introduced its "Standards of Behavior Management Policy," which provides that "management Team Members are to set an example of professional behavior for other Team Members and are expected to be at work on time [and] maintain a good attendance record . . . ." (Doc. 41-2 § 4.4). This, combined with the Documented Coaching and Disciplinary Notes issued to Clemons, which referenced Hillshire's expectations regarding attendance and informed Clemons that future unapproved absences could result in

---

[16] Lucas testified that her connection to Clemons's termination was limited to "giving information on days missed," but that she was not the decision-maker, and that termination decisions were made by Miller and "[h]er boss." (Doc. 48-2, Lucas Dep. at 17:15-18, 18:6-18, 81:9-15).

his termination, (Doc. 41-3 at 1; Doc. 41-4 at 1; Doc. 41-5 at 1; Doc. 41-18 at 1), is evidence that Hillshire did follow its own policy regarding termination for attendance issues.

Clemons has also admitted that he only learned about other employees' absences and the reasons for them, or lack thereof, from conversations with Lucas. (*Id.;* Doc. 48-1, Clemons Aff. ¶¶ 36, 38). Because Lucas's statements to Clemons constitute inadmissible hearsay, this Court may not consider Hillshire's alleged conduct with respect to those employees in the context of a motion for summary judgment. *See Flones v. Beaumont Health Sys.*, 567 F. App'x 399, 405 (6th Cir. 2014) ("[I]t is well established that a court may not consider inadmissible hearsay when deciding a summary-judgment motion.").

But even if Lucas's statements to Clemons could be considered, Clemons has testified that he was never aware of "the full extent of the background" of one referenced employee, Jimmy James's ("James"), absences. (Doc. 54-1, Clemons Dep. at 52:15-22). Indeed, Clemons has failed to establish whether James was a management team member subject to the same "Standards of Behavior Management Policy" as Clemons, whether James had previously received similar Documented Coaching or Disciplinary Notes including warnings that continued attendance issues could result in termination, or whether James had previously received a "Final Notice" like the one Clemons received regarding his attendance.

29

Although Clemons testified that Lucas told him James never requested FMLA leave or an accommodation under the ADA, (Doc. 48-1, Clemons Aff. ¶ 36), Clemons admittedly lacks personal knowledge as to why James was absent or whether his absences were approved pursuant to another company policy. Accordingly, Hillshire's decision not to terminate James is not evidence from which a reasonable jury could conclude that Clemons's absences were insufficient to warrant his termination under Hillshire's policy, particularly after Hillshire warned Clemons on multiple occasions that he could be terminated for continued attendance issues.

Other than James, Clemons only argues that two other employees received more favorable treatment. (Doc. 48 at 19). Each of those employees allegedly received two weeks of paid paternity leave in 2017, while Clemons received only one the next year. (Doc. 48-1, Clemons Aff. ¶ 38). However, that evidence has no bearing on whether Hillshire retaliated against Clemons for requesting FMLA leave due to neck and hip issues in 2019. Similarly, Clemons's contention that "Hillshire also regularly skirted USDA sanitation regulations," (Doc. 48 at 19), fails to help him establish pretext for the purpose of an FMLA retaliation claim.

Although Clemons also cites the temporal proximity between his attempts to exercise his FMLA rights and his termination as evidence of pretext, "[u]nlike its role in establishing a prima facie case, 'the law in this [C]ircuit is clear that temporal

30

proximity cannot be the sole basis for finding pretext.'" *Seeger*, 681 F.3d at 285 (quoting *Donald*, 667 F.3d at 763). Accordingly, because none of the other evidence cited by Clemons supports his pretext argument, his FMLA retaliation claim also fails for this reason.

### C. Disability Discrimination – Wrongful Termination

Because Clemons does not allege that he has introduced direct evidence of wrongful termination due to disability discrimination, the *McDonnell Douglas* burden-shifting framework also applies to that claim. *See Hrdlicka*, 63 F.4th at 566 (citing *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 703 (6th Cir. 2008)).

#### i.   Prima Facie Case

To establish his prima facie case, Clemons must demonstrate that (1) he had a disability; (2) he was otherwise qualified to perform the essential functions of his position; (3) he suffered an adverse employment action; (4) Hillshire knew or had reason to know of his disability; and (5) his position remained open or a non-disabled person replaced him. *See Gecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 321 (6th Cir. 2012) (citing *Brenneman*, 366 F.3d at 417). Hillshire argues that Clemons cannot establish the first, second, fourth, or fifth element of his claim. (Doc. 41 at 18).

Clemons has brought his disability discrimination claims under both the ADA and the KCRA. (Doc. 1-1 ¶¶ 40-53).[17] "Because the language of the KCRA mirrors (for the most part) that of the [ADA], 42 U.S.C. § 12101 *et seq.*, courts interpret the KCRA consistent with the ADA." *Laferty v. United Parcel Serv., Inc.*, 186 F. Supp. 3d 702, 707-08 (W.D. Ky. 2016) (footnote omitted) (collecting cases).

However, the KCRA and the ADA diverge in one relevant respect: the KCRA did not incorporate the ADA Amendments Act of 2008 (ADAAA), which broadened the definition of "disability," and, therefore, courts apply pre-ADAAA jurisprudence to determine whether an individual is "disabled" under the KCRA. *See id.* at 707 n.3 (collecting cases); *Watkins v. Shriners Hosps. for Child., Inc.*, No. 5:18-CV-548-REW-MAS, 2020 WL 2309468, at *9 (E.D. Ky. May 8, 2020) (collecting cases). Accordingly, Hillshire does not dispute that Clemons was disabled under the ADA, but instead argues that he has failed to show that he was disabled under the KCRA. (Doc. 41 at 18).

The KCRA defines a disability as "(a) [a] physical or mental impairment that substantially limits one (1) or more of the major life activities of the individual; (b) [a] record of such an

---

[17] Notably, in his Response to Hillshire's Motion for Summary Judgment, Clemons limits his references to the KCRA to arguments "shoehorned under the ADA." (*See* Doc. 48 at 9, 12-14, 17).

impairment; or (c) [b]eing regarded as having such an impairment."
K.R.S. § 344.010(4). However, under pre-ADAAA jurisprudence, "[a]n
'impairment that only moderately or intermittently prevents an
individual from performing major life activities is not a
substantial limitation' . . . ." *Bryson v. Regis Corp.*, 498 F.3d
561, 576 (6th Cir. 2007) (quoting *Mahon v. Crowell*, 295 F.3d 585,
590–91 (6th Cir. 2002)).

Instead, a plaintiff must establish that he cannot perform a
major life activity that someone from the general population could
perform or that he is significantly restricted as to the condition,
manner, or duration under which he can perform a particular major
life activity as compared to someone from the general population.
*Rose v. United Parcel Serv., Inc.*, No. 5:17-CV-378-REW, 2019 WL
1370849, at *8–9 (E.D. Ky. Mar. 26, 2019) (citing *Hallahan v. The
Courier-Journal*, 138 S.W.3d 699, 708 (Ky. 2004)). To satisfy this
standard, "claimants must 'prove a disability by offering evidence
that the extent of the limitation [caused by the impairment] in
terms of their own experience . . . is substantial.'" *Id.* at *8
(quoting *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184,
198 (2002)).

Here, Clemons argues that his neck pain, which Dr.
Schertzinger diagnosed as a brachial plexus strain, cervical
sprain, and a C5/6 spondylotic bulge, and his hip pain, which Dr.
Popham diagnosed as left snapping hip syndrome, substantially

33

interfered with his ability to participate in the major life activities of sleeping, walking, moving, driving, lifting and carrying objects weighing more than fifteen pounds, reaching above his shoulders, twisting his body, and working. (Doc. 41-8 at 5; Doc. 41-22 at 1–2; Doc. 48 at 10–11; Doc. 48-1, Clemons Aff. ¶¶ 19, 39).

While Hillshire cites Clemons's statements to Dr. Popham that he could comfortably walk for eight to ten hours and perform housework, leisure activity, and work, (Doc. 41-8 at 6–7), and his bowling records, (Doc. 41-9), as evidence that his ability to engage in major life activities was not substantially limited, whether an impairment substantially limits a major life activity is generally a question of fact for the jury's determination. *See Norton Healthcare, Inc. v. Turner*, No. 2019-CA-0328-MR, 2021 WL 4228329, at *3 (Ky. Ct. App. Sept. 17, 2021) (citing *Hallahan*, 138 S.W.3d at 707).

However, even if a reasonable jury could find that Clemons was disabled under the KCRA's definition, his wrongful termination claim under that statute and his identical claim under the ADA fail for other reasons. As to the second element, "[a]n employee is deemed qualified only if she can perform all of the essential functions of her job, whether accommodated or not." *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 391 (6th Cir. 2017) (citing 42 U.S.C. § 12111(8)).

34

Here, Clemons argues that he was qualified for his position and that he would have been able to perform the essential functions of his job if Hillshire had granted him accommodations in the form of a modified schedule and medical leave. (Doc. 48 at 14, 21). However, Hillshire argues that he was not qualified for his position because he could not perform the essential function of attending work reliably. (Doc. 41 at 19).

Clemons does not dispute that regular attendance was an essential function of his job as a Production Supervisor. The Sixth Circuit has also held that "[r]egular, in-person attendance is an essential function—and a prerequisite to essential functions—of most jobs, especially the interactive ones." *EEOC v. Ford Motor Co.*, 782 F.3d 753, 762–63 (6th Cir. 2015) (en banc). Accordingly, the Court finds that regular and predictable attendance was an essential function of Clemons's position and Clemons's repeated absences rendered him unable to perform other essential duties, including supervising the production process at the facility and ensuring that the employees he was responsible for performed their jobs adequately.

Clemons's attendance record, which reflects that he missed at least nine shifts during the last month of his employment, (Doc. 48-9 at 12–17), establishes that he could not perform the essential function of reliably attending work. *See Williams*, 847 F.3d at 393 (finding that an employee was not qualified for her job on the

35

basis of her attendance record); *Trego v. Bullitt Cnty. Fiscal Ct.*, No. 3:20-CV-00272-CRS, 2022 WL 2374390, at *8 (W.D. Ky. June 30, 2022) (finding that where an employee had nine unapproved absences, she was not qualified for her position).

Clemons attempts to argue to the contrary by pointing out that Hillshire internally determined that he was qualified when it promoted him to a supervisory position, (Doc. 48 at 21), but that contention fails to address the attendance issues Clemons developed after his promotion.[18] Similarly, Clemons's attempt to introduce the positive performance reviews he has received in his new position as a manger of sanitation at another food-processing facility, despite "some unexcused absences," (*Id.* at 21–22; Doc. 48-11 at 1–9), does not establish that he could satisfactorily perform the essential functions of a different job at Hillshire.

However, because it is undisputed that Clemons's absences were related to his disability, his absenteeism cannot render him unqualified for his position if he proposed a reasonable accommodation that could have cured it. *See Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 418–19 (6th Cir. 2020); *Williams*, 847 F.3d at 393 (citing *Ford*, 782 F.3d at 763). But, even if the Court construes Clemons's request for leave under the FMLA and the

---

[18] Of the twelve absences referenced in the Disciplinary Note to File from August 7, 2018, only three were incurred before Clemons's promotion on December 18, 2017. (*See* Doc. 41-4 at 1).

Certification submitted by Dr. Popham as requests for accommodation in the form of a modified schedule, as Clemons has argued, (Doc. 48 at 14), and even if the Court also concludes that those requests were reasonable, Clemons has not shown that those accommodations would have enabled him to perform the essential function of attending work on the days his modified schedule required him to do so.

In *Williams*, the Sixth Circuit held that, where an employee requested accommodations in the form of flexible scheduling and modified breaks but had not shown that she could perform her job duties even under the conditions she proposed, she had failed to make a prima facie showing that she was otherwise qualified for her position. 847 F.3d at 393–94.

As discussed above, to the extent Dr. Popham requested a modified schedule on Clemons's behalf, she only asked that he be permitted FMLA leave for two shifts per month, (Doc. 41-11 at 2; Doc. 41-13 at 4), and Clemons has not alleged that he requested permission to miss shifts more often or that he proposed any other form of accommodation.[19] But, just as in *Williams*, as illustrated by the undisputed fact that Clemons missed at least nine shifts during the last month of his employment, a schedule reduced by two

---

[19] Clemons notes that he informed Lucas that his medications interfered with his ability to work, (Doc. 48 at 14; Doc. 48-1, Clemons Aff. ¶ 22), but does not allege that he requested any accommodations that would have allowed him to work while taking those medications.

shifts that month would not have enabled him to meet Hillshire's attendance and reliability standards. Accordingly, Clemons has failed to establish that he was otherwise qualified for his position, even with the accommodations he claims he requested.

While there is at least a genuine issue of material fact as to whether Clemons's text messages to Lucas regarding his pain, doctor's visits, diagnoses, potential treatments, and MRI results, (Doc. 48-9 at 1-17), were sufficient to put Hillshire on notice that Clemons was disabled, *see Cady v. Remington Arms Co.*, 665 F. App'x 413, 417-18 (6th Cir. 2016) (holding that a jury could find that an employer had notice of an employee's disability where the employee informed a manager of his back pain, surgeries, doctor's appointments, and MRI results), Clemons has also failed to establish the fifth element of his prima facie case.

In his Response to Hillshire's Motion, Clemons merely states that "[t]here's no genuine dispute of material fact that . . . his position remained open, or that [Hillshire] sought other applicants to replace him." (Doc. 48 at 16). However, that ignores Hillshire's argument that "Clemons cannot establish the first, second, fourth, or *fifth* elements." (*See* Doc. 41 at 18) (emphasis added). Further, there is no evidence in the record regarding who, if anyone, replaced Clemons as Third-Shift Production Supervisor and whether that person was disabled. Thus, Clemons has failed to satisfy his burden of setting forth specific facts showing that

there is a genuine issue of material fact as to the fifth element and his prima facie case also fails for that reason. *See Moldowan*, 578 F.3d at  374.

Because Clemons has failed to point to facts that would enable a reasonable jury to find that he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodations, and that his position remained open or he was replaced by a non-disabled person, he has not established a prima facie case of wrongful termination based on disability discrimination under the KCRA or the ADA.

### *ii.  Pretext*

Further, even if Clemons had sufficiently established his prima facie case as to this claim, he has not shown that Hillshire's proffered nondiscriminatory reason for his termination, excessive absences, was a pretext for unlawful discrimination. Clemons does not raise any arguments regarding pretext as to disability discrimination that he did not also raise regarding pretext as to FMLA retaliation, and, therefore, he cannot show pretext for the same reasons discussed above.

### D. Disability Discrimination – Failure to Accommodate

Because failure to accommodate is expressly listed in the ADA's definition of disability discrimination, courts apply the direct evidence test where an employee's claim is premised upon

39

his employer's failure to accommodate. *Blanchet v. Charter Commc'ns, LLC*, 27 F.4th 1221, 1227 (6th Cir. 2022) (citing 42 U.S.C. § 12112(b)(5)(A); *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007)).

Under the direct evidence test, the plaintiff bears the initial burden of establishing that (1) he is disabled and (2) he is otherwise qualified for his position despite his disability. *Id.* at 1228 (citing *Kleiber*, 485 F.3d at 869). If the plaintiff satisfies that burden, the employer "then bears the burden of 'proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon' the company." *Id.* (quoting *Kleiber*, 485 F.3d at 869). The same test is applied under the KCRA. *See Laferty*, 186 F. Supp. 3d at 708 (collecting cases).

As discussed above, Hillshire does not dispute that Clemons was disabled under the ADA and there is at least a genuine issue of material fact as to whether he was disabled under the KCRA. Thus, Clemons must show that he was otherwise qualified for his job: (a) without accommodation from Hillshire; (b) with an alleged "essential" job requirement eliminated; or (c) with a proposed reasonable accommodation. *See Blanchet*, 27 F.4th at 1228 (citing *Kleiber*, 485 F.3d at 869).

As analyzed above, Clemons's attendance record establishes that he was not qualified for his job at Hillshire without

40

accommodation. *See Williams*, 847 F.3d at 393; *Trego*, 2022 WL 2374390, at *8. Similarly, Clemons does not and cannot argue that he would have been qualified for his job if the "essential" requirement of in-person attendance was eliminated, as he would necessarily have been unable to fulfill his other duties, namely supervising facility processes, ensuring facility compliance with relevant regulations, and overseeing other employees, if he was not physically present for work.

As to the third method of showing that an employee is otherwise qualified, "[t]he *employee* bears the burden of proposing an accommodation that will permit her to effectively perform the essential functions of her job." *Ford*, 782 F.3d at 763 (citing *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th Cir. 2010)). As discussed above, Clemons has failed to meet this burden.

Although Hillshire argues that Clemons never requested an accommodation, even if the Court determines that his request for FMLA leave of two shifts per month was also a request for an accommodation, Clemons must show that, when he returned to work after his leave, he would be qualified to perform the essential functions of his job. *See Blanchet*, 27 F.4th at 1229 (citing *Williams*, 847 F.3d at 394) (finding that where a proposed accommodation is medical leave, the employee must show that he would be otherwise qualified to perform essential job functions upon returning to work).

41

However, as the Court has determined with respect to Clemons's wrongful termination claim, the evidence shows that, even had he been granted his proposed accommodation and thereby had two shifts of approved leave per month, he would not have been able to attend his other scheduled shifts reliably. Indeed, the fact that he missed nine shifts during his final month of employment, (Doc. 48-9 at 12-17), illustrates that his proposed accommodation would not have rendered him "otherwise qualified" for his position at Hillshire.

Because Clemons has failed to establish a genuine dispute of material fact as to whether he was "otherwise qualified" for his position, the Court need not decide whether his proposed accommodation was reasonable or whether it would impose an undue hardship on Hillshire.

Similarly, the Court need not address Clemons's claim that Hillshire failed to engage in an interactive process with him because "an employer's failure to engage in the interactive process is actionable only if the employee can demonstrate that she was qualified for the position." *See Williams*, 847 F.3d at 395 (citing *Ford*, 782 F.3d at 766). Accordingly, Clemons's failure to accommodate claims under the ADA and the KCRA fail as a matter of law.

### E. ADA and KCRA Retaliation

Because Clemons does not claim to have direct evidence of ADA retaliation, the Court must analyze his claims using the familiar *McDonnell Douglas* burden-shifting framework. *See Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014) (citing *A.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013)). Claims for retaliation under the KCRA are analyzed under the same standards as claims for retaliation under the ADA. *Trego*, 2022 WL 2374390, at *17 (citing *Bryson*, 498 F.3d at 574).

### i. Prima Facie Case

To establish a prima facie case of ADA retaliation, the plaintiff must show: (1) he engaged in activity protected by the ADA; (2) his employer knew of that activity; (3) his employer took an adverse action against him; and (4) there was a causal connection between the protected activity and the adverse action. *Rorrer*, 743 F.3d at 1046 (citing *A.C.*, 711 F.3d at 697).

Although Hillshire disputes that requesting an accommodation is protected activity, "[t]he Sixth Circuit has held that requests for accommodation are protected acts that can give rise to a retaliation claim." *See Schobert v. CSX Transp. Inc.*, 504 F. Supp. 3d 753, 785 (S.D. Ohio 2020) (citing *Bryson*, 498 F.3d at 577; *Ellis v. Tennessee*, 603 F. App'x 355, 359 (6th Cir. 2015)). Because, as discussed above, the Sixth Circuit has construed requests for

43

medical leave as accommodation requests, *see Blanchet*, 27 F.4th at 1229, the Court will construe Clemons's request for FMLA leave as a request for an accommodation that Hillshire was undisputedly aware of. Accordingly, Clemons has satisfied the first two elements of his prima facie case. Similarly, Hillshire does not dispute that it took an adverse action against Clemons by terminating him, thereby satisfying the third element.

However, Clemons's prima facie case fails on the fourth element. Just as with respect to his FMLA retaliation claim, Clemons's only evidence of causation as to ADA retaliation is the temporal proximity between his request for FMLA leave and his termination. (*See* Doc. 48 at 17–18). Likewise, just as for FMLA retaliation claims, temporal proximity is only sufficient evidence of a causal connection for ADA retaliation claims where the adverse employment action occurs "very close" in time after the employer learns of protected activity but is not enough on its own where "some time elapses" between those events. *See Barlia v. MWI Veterinary Supply, Inc.*, 721 F. App'x 439, 450–51 (6th Cir. 2018) (citing *Mickey*, 516 F.3d at 525).

But even if the Court could find that the nine-week period here satisfies the "very close" standard, despite Clemons's failure to cite a case so holding, as discussed above, that temporal proximity is no longer persuasive evidence of causation when considered together with the evidence that Hillshire

44

contemplated terminating Clemons for attendance issues well before he requested FMLA leave and the evidence that Hillshire had an intervening legitimate reason to terminate Clemons because he incurred numerous unprotected absences after filing his request. Thus, Clemons cannot rely on temporal proximity to satisfy the causation element of his ADA and KCRA retaliation claims and his prima facie case fails as a result.

### ii.   Pretext

Further, even if Clemons had sufficiently established his prima facie ADA retaliation case, he has not shown that Hillshire's proffered nondiscriminatory reason for his termination, excessive absences, was pretextual. Just as for FMLA retaliation, "'temporal proximity cannot be the sole basis for finding pretext'" in the context of an ADA retaliation claim. *See Ford*, 782 F.3d at 767 (quoting *Donald*, 667 F.3d at 763).

Because the additional arguments offered by Clemons, that Lucas's discriminatory animus was the cause of the decision to terminate him and other employees were not terminated for similar absences, cannot demonstrate pretext for the reasons outlined above, his temporal proximity argument also fails. Therefore, Hillshire is entitled to judgment as a matter of law on Clemons's

ADA and KCRA retaliation claims on this additional, independent ground.[20]

### F. Wrongful Termination in Violation of Public Policy

Clemons's final claim is that his termination violated public policy. (Doc. 1-1 ¶¶ 59–62).[21] However, under Kentucky law, such claims are preempted where the statute that establishes the public policy also establishes a cause of action and a remedy for violations of that public policy. *Hill v. Ky. Lottery Corp.*, 327 S.W.3d 412, 421 (Ky. 2010) (citing *Grzyb v. Evans*, 700 S.W.2d 399, 401 (Ky. 1985)).

Here, the only public policies that Clemons alleges have been violated are those embodied in the ADA, FMLA, and KCRA, which allow him to request FMLA leave and accommodations without suffering adverse consequences for doing so. (Doc. 1-1 ¶¶ 60–61). Each of these statutes provides a statutory cause of action and remedy for the violations Clemons claims Hillshire has committed and, indeed,

---

[20] Because the Court finds that Hillshire is entitled to summary judgment on all of Clemons's KCRA claims, it need not evaluate Hillshire's argument that the KCRA does not permit emotional distress damages. (*See* Doc. 41 at 22–25).

[21] Notably, Clemons does not reference his public policy claim in his Response to Hillshire's Motion for Summary Judgment. This failure alone is sufficient to allow the Court to grant summary judgment in favor of Hillshire. *See Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011) (citing *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 528 (7th Cir. 2005)) (finding that a district court properly granted summary judgment on a claim the plaintiff failed to address in his response to the defendant's summary judgment motion).

as addressed above, Clemons has brought claims under each of those statutes to seek those remedies.

Other courts in this District have held that claims for wrongful termination in violation of public policy based on the ADA, the FMLA, and the KCRA were preempted. *See, e.g.*, *Adkins v. Excel Mining, LLC*, 214 F. Supp. 3d 617, 627–28 (E.D. Ky. 2016) (finding that an employee's public policy claim was preempted where he claimed that he was terminated in violation of the ADA and the KCRA); *Parks v. UPS Supply Chain Sols., Inc.*, No. 11-404-DLB-CJS, 2014 WL 414230, at *13-14 (E.D. Ky. Feb. 4, 2014) (collecting cases) (finding that an employee's public policy wrongful termination claim was preempted where it was based on the FMLA and the KCRA).

The proper remedy for any wrongful termination based on violations of the ADA, the FMLA, and the KCRA would come from those statutes and not from a separate cause of action under common law. Thus, Hillshire is also entitled to summary judgment on Clemons's public policy claim.

### G. Defendant's Motion to Strike or Disregard Plaintiff's Affidavit and Plaintiff's Motion to Exclude Miller's Declaration or Take Additional Discovery

Hillshire also argues that Clemons's Affidavit, (Doc. 48-1), should either be stricken or disregarded by the Court because it

directly contravenes his deposition testimony. (Doc. 54 at 1). However, the Court need not decide this Motion. As discussed above, there are no genuine issues of material fact that would require submission of any of Clemons's claims to a jury even when his Affidavit is taken into consideration. Therefore, the Court will deny Hillshire's Motion to Strike or Disregard Plaintiff's Affidavit as moot.

Clemons's Motion to Exclude Miller's Declaration or to Take Additional Discovery, (Doc. 56), fares similarly. Because the Court finds that summary judgment is appropriate as to all Clemons's claims without considering Miller's Declaration, Plaintiff's Motion to Exclude that Declaration will be denied as moot.

Likewise, Clemons's Alternative Motion to Take Additional Discovery by deposing Miller will also be denied as moot because his claims fail for reasons that are unrelated to Miller's statements. *See Quartermouse v. Bullitt Cnty. Fiscal Ct.*, No. 3:19-CV-264-DJH-RSE, 2020 WL 12309716, at *2 (W.D. Ky. Aug. 25, 2020) (citing *Loc. Union 369, Int'l Bhd. of Elec. Workers v. ADT Sec. Servs., Inc.*, 393 F. App'x 290, 295 (6th Cir. 2010)) (finding that whether the desired discovery could alter the outcome of a motion is often dispositive in a Rule 56(d) analysis).

### *Conclusion*

Therefore, for the reasons stated above, **IT IS ORDERED** that:

(1) Defendant's Motion for Summary Judgment (Doc. 41) be, and is hereby, **GRANTED;**

(2) Defendant's Motion to Strike or Disregard Plaintiff's Affidavit (Doc. 54) be, and is hereby, **DENIED AS MOOT;**

(3) Plaintiff's Motion to Exclude the Declaration of Lauren Miller or to Take Additional Discovery (Doc. 56) be, and is hereby, **DENIED AS MOOT;**

(4) Defendant's Motion to Strike or Disregard Plaintiff's Sur-Reply (Doc. 62) be, and is hereby, **DENIED;**

(5) Defendant's Motion for Leave to File a Sur-Reply (Doc. 68) be, and is hereby, **GRANTED** and Defendant's Sur-Reply (Doc. 68-1) and the exhibits attached thereto (Doc. 68-2; Doc.68-3; Doc. 68-4) are deemed filed concurrently herewith; and

(6) A separate judgment shall enter concurrently herewith.


This 9th day of June 2023.



**Signed By:**

**_William O. Bertelsman_**  W️OB

**United States District Judge**